IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BARTON ENG and WENDEE ENG, | CIVIL NO. 22-00309 JAO-WRP |
| Plaintiffs, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT EWELL D. MILLER'S MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| TYLER BANTA, et al., | |
| Defendants. | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT
EWELL D. MILLER'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Barton and WenDee Eng (collectively, "Plaintiffs" or "the Engs")

commenced this action against a number of defendants including:  James Conaway

and Lorraine Conaway (collectively, "the Conaways"); STL 100, LLC ("STL");

Tycon Yorba 151, LLC ("Tycon 151"); Tyler Banta ("Banta"); Tycon Properties,

Inc.; Bert Miller; Shelby Holdings, LLC ("Shelby Holdings"); New Paradigm

Financial, Inc. ("NPF"); St. Louis Redevelopment Company, LLC; GM Realty,

Inc.; GM Realty Management, Inc.; and Giro Katsimbrakis ("Katsimbrakis").

Defendant Ewell D. Miller ("Miller"), identified in the caption as Bert Miller,

seeks summary judgment on all claims against him on the ground that no genuine

issue of material fact exists as to his affirmative defense of lack of personal

jurisdiction.  For the following reasons, the Court GRANTS the Motion in part and DENIES it in part.

## I.  BACKGROUND

For the purposes of this Order, the Court recites only the facts pertinent to the claims against Miller and the entities for which he is alleged to have served as a president or member.  Generally, Plaintiffs allege that Miller swindled money from them by making false promises related to, among other things, borrowing money from Plaintiffs, selling properties to Plaintiffs without transferring title to them, and promoting himself as part of a real estate investment team with his co-defendants.

### A.    Facts

Unless otherwise indicated, the following facts are undisputed.

Miller resides in Tennessee and is the President of Defendant GM Realty, Inc., a Tennessee corporation that sometimes does business as GM Realty Property Management.  ECF No. 87 (Miller's Concise Statement of Facts ("MCSF")) at 2 ¶¶ 1–2; ECF No. 91 (Plaintiffs' Concise Statement of Facts ("PCSF")) at 2 ¶¶ 1–2. He is also a member of Defendant Shelby Holdings, which has its principal office in Tennessee.  MCSF at 2 ¶ 3; PCSF at 2 ¶ 3.

### 1.      The Loans and Related Promissory Notes

It is unclear from the record how Miller and Barton Eng first met, but the parties agree that Miller met with Barton Eng in Tennessee sometime in 2016. PCSF at 3 ¶ 13; ECF No. 95 (Miller's Concise Statement of Facts in Reply ("MRCSF")) at 4 ¶ 13.  Thereafter, Miller signed two promissory notes ("the Notes"), which detailed money payments that would be made to an IRA account belonging to Barton Eng, presumably in exchange for loans.  MCSF at 4 ¶ 13; ECF No. 18-1 at 2.  The parties dispute whether Miller signed the Notes in his individual capacity or on behalf of Shelby Holdings.  MRCSF at 4 ¶ 12.  In any event, the notations "Unsecured Note," "Straight Note," and "State of Hawaii" appear at the top of each of the Notes, one of which is for $200,000 and the other for $130,000; both Notes were dated June 11, 2017.  *See* ECF No. 18-1 at 2; *id*. at 18-2 at 2.  Miller avers that on or about September 5, 2017, Shelby Holdings made a $20,000 payment in connection with the Notes.  MCSF at 4 ¶ 20.  Plaintiffs refute this statement, contending that "[they] never received a single payment on either Note."  PCSF at 4 ¶ 20.

Plaintiffs also state that Barton Eng executed the Notes in Hawai'i and then transmitted the Notes by email to Miller.  *See* ECF No. 91-7 at 2.  Plaintiffs allege that Barton Eng executed the Notes in Hawai'i pursuant to the overall client "plan" for the Plaintiffs.  PCSF at 4 ¶ 13.  Miller refutes these allegations, counter alleging

that "he did not sign contract [sic] with Plaintiffs in his individual capacity and is unaware of and played no role in any 'plan' concerning Plaintiffs," MRCSF at 4 ¶ 13, and that Mr. Eng "emailed the signed notes to Defendant Banta, not Miller," *Id.* at 5 ¶ 17. Based on these statements, it is unclear if Miller refutes that Barton Eng executed the Notes in Hawai'i, but both parties agree that neither Miller nor Shelby Holdings prepared the Notes. PCSF at 4 ¶ 18.

### 2. The Property Management Agreement

Miller and Plaintiffs also signed a Property Management Agreement ("PMA") on October 10, 2017. MCSF at 5 ¶ 23; PCSF at 4 ¶ 23. The parties dispute the genesis of the agreement.

According to Miller, sometime after signing the Notes, Barton Eng contacted him regarding GM Realty, Inc.'s property management services because Barton Eng was looking for someone to manage his properties in Missouri. MCSF at 4 ¶ 21. But Barton Eng asserts, "[t]his property management by Miller of Plaintiff's [sic] properties was part of a 'plan' developed by Defendant Tyler Banta on behalf of the 'team,' which included Miller." PCSF at 4 ¶ 21. In any event, it is undisputed that, pursuant to the PMA, Defendant GM Realty, Inc. provided property management services for Plaintiffs' investment properties in St. Louis. MCSF at 4 ¶ 24; PCSF at 4 ¶ 24. It is also undisputed that Miller was not involved

in the sale of any of the investment properties to Plaintiffs.  MCSF at 5 ¶ 25; PCSF at 5 ¶ 25.

### 3. Miller's Hawai'i Trips

Miller traveled to Hawai'i on three occasions—first, in May 2015, he visited the islands for pleasure, and in September 2017 and October 2019, he visited "in connection with presentations by Miller to potential investors concerning investment property opportunities outside of Hawaii."  MCSF at 2 ¶ 4; PCSF at 2 ¶ 4.  Miller did not meet or converse with Plaintiffs during any of these trips.  MCSF at 2 ¶ 6; PCSF at 2 ¶ 6.

Miller and Plaintiffs dispute the nature of Miller's involvement with a team of people who traveled to Hawai'i to offer investment opportunities involving real estate.  Plaintiffs aver that Miller's travel to Hawai'i "was because he and his companies were an integral part of a 'turnkey team' actively obtaining and soliciting business at events here in Hawaii."  PCSF at 2 ¶ 4.  Miller denies being part of any "turnkey team" with the co-defendants in this case, but acknowledges that he had past business relationships with them.  MRCSF at 2 ¶ 4.

Regarding the "team," the parties at least agree that Miller attended an event at a hotel in Hawai'i on October 5, 2019, along with several other co-defendants.  PCSF at 2 ¶¶ 5, 7; MRCSF at 2 ¶¶ 4, 7.  They also appear to agree that Miller himself did not say anything during the event about being part of the team; rather,

Plaintiffs assert that "Miller did appear with members of the 'team' and *others* so represented.  However, he was already known to Plaintiffs as a partner in the 'turnkey team.'"  PCSF at 2 ¶ 7 (emphasis added).  Miller denies ever representing that he was involved in any venture with the co-defendants.  MRCSF at 2 ¶ 7.

**B.    Allegations in the Second Amended Complaint**

In all but one of the claims, the SAC primarily alleges a series of torts, the gist of which involved all the defendants tricking Plaintiffs into investing their money to purchase rental properties in St. Louis for which Plaintiffs never actually received title and from which they received no benefit.  Plaintiffs assert that they suffered their injuries in Hawaiʻi:

> Plaintiffs suffered injuries in the City and County of Honolulu, State of Hawaii from the tortious conduct of these Defendants in their breaches of fiduciary duties, negligence, and fraud conducted either in Hawaii or outside of Hawaii.  Thus, Defendants committed torts either in Hawaii or outside of Hawaii that caused injuries in the State of Hawaii, and the Court has personal jurisdiction over these Defendants.

ECF No. 18 at 7 ¶ 36; *see also id*. at 7 ¶ 30 ("The injuries to Plaintiffs as alleged herein occurred in the State of Hawaii.").  In the one claim sounding in contract, Plaintiffs allege that Defendants Miller and Shelby Holdings failed to pay the Notes that had been executed between Barton Eng and Defendants Miller and Shelby Holdings.  *Id*. at 12 ¶¶ 63–65.

6

More specifically, the SAC alleges the following claims against Miller:

Third Cause of Action:  Enforcement of a Promissory Note.  Plaintiffs here allege that Defendants Banta and Miller "persuaded Plaintiff Barton Eng to withdraw $330,000 in funds out of his self-directed IRA and lend those funds to Defendant Shelby Holdings" and he did so "[i]n early June of 2017."  *Id*. at 12 ¶¶ 59, 62.

Fourth Cause of Action:  Misrepresentation.  Plaintiffs do not indicate *when* the events occurred that give rise to this claim, but, with regard to Miller, Plaintiffs accuse him and Defendants GM Realty and GM Realty Management of representing to Plaintiffs that they had rehabbed Plaintiffs' property located at "4425 Michigan," when they had not.  *Id*. at 13 ¶ 70.  Plaintiffs also accuse him, "GM Realty and/or GM Realty Management," Defendant Katsimbrakis, and "St. Louis Redevelopment" of selling Plaintiffs a property at "3100 Mt Pleasant," but failing to deliver title and falsely representing that the home was rehabbed, or would be rehabbed by GM Realty and/or GM Realty Management.  Plaintiffs further accuse that group of Defendants of providing Plaintiffs with a "Scope of Work" document that related to a different property, along with pictures of the alleged rehabbed property only, and not of the property in its original condition. And Plaintiffs allege that the property was never rehabbed as represented to them. *Id*. at 13–14 ¶¶ 71–73.

7

Fifth Cause of Action: Fraud. Plaintiffs—again without offering a date for any of these events—assert in this claim that Miller along with Defendants GM Realty, GM Realty Management, Katsimbrakis, St. Louis Redevelopment, Tycon Properties, Tycon 151, STL, and NPF engaged in fraudulent conduct and made false statements to them. *Id*. at 17 ¶¶ 86–87. It appears that Miller's allegedly fraudulent statements are the same statements alleged in the Misrepresentation claim. *See id*. at 17 ¶ 86 (referring to the "fraudulent conduct and statements" in the "paragraphs above").

Sixth Cause of Action: Hawai'i Revised Statutes Section 480: Unfair and Deceptive Trade Practices ("UDAP"). Plaintiffs assert that Miller along with Defendants Banta, GM Realty, GM Realty Management, Katsimbrakis, St. Louis Redevelopment, Tycon Properties, Tycon 151, STL, and NPF engaged in unfair or deceptive trade practices by, among other things, failing to deliver title to the properties mentioned above and falsely representing that the properties would be "fully rehabbed," that the properties "would never be vacant more than 3 months," and that Plaintiffs had actually purchased the properties. *Id*. at 18–19 ¶ 90. In this claim, Plaintiffs further accuse Miller, along with Defendants the Conaways and Banta, of "appear[ing] together at an event" held at a Honolulu hotel on October 5, 2019, when they informed the audience that they were all members of a partnership team, which was false. *Id*. at 19–20. Plaintiffs assert that the

statements made at the hotel "were . . . consistent with the representations made . . . that these Defendants . . . were part of a cohesive 'team' or 'partnership' that was fully capable of undertaking and providing complete 'turnkey' professional services for the Plaintiffs' real estate investment, management, and tax needs." *Id*. at 20 ¶ 95.  Plaintiffs allege that they detrimentally relied on these representations. *Id*. at 20 ¶ 96.

## C.  Relevant Procedural History

Miller filed his Motion for Summary Judgment based on lack of personal jurisdiction on February 10, 2023 ("Motion").  ECF No. 86.  Plaintiffs filed their Opposition on March 9, 2023.  ECF No. 90.  Miller filed his Reply on April 6, 2023.  ECF No. 94.  The Court held a hearing on the Motion on May 4, 2023.  ECF No. 97.

## II.  LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  "A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see T.W.*

*Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.

1987).  When reviewing a motion for summary judgment, the court must view the

facts in the light most favorable to the nonmoving party.  *See State Farm Fire &*

*Cas. Co. v. Martin*, 872 F.2d 319, 320 (9th Cir. 1989) (per curiam).

Once the moving party has met its burden of demonstrating the absence of a

genuine issue of material fact, the nonmoving party must set forth specific facts

showing that there is a genuine issue for trial.  *See T.W. Elec.*, 809 F.2d at 630;

Fed. R. Civ. P. 56(c).  The nonmoving party may not defeat a motion for summary

judgment if it fails to produce significant probative evidence tending to support its

legal theory.  *See Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551,

1558 (9th Cir. 1991).  The nonmoving party cannot stand only on its pleadings, nor

can it merely assert that it will be able to discredit the movant's evidence at trial.

*See T.W. Elec.*, 809 F.2d at 630.

If the nonmoving party fails to assert specific facts beyond the mere

allegations or denials in its response, summary judgment, if otherwise appropriate,

shall be entered.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884 (1990); Fed.

R. Civ. P. 56(e).  There is no genuine issue of fact if the nonmoving party fails to

offer evidence sufficient to establish the existence of an element essential to its

case.  *See Celotex*, 477 U.S. at 322; *Citadel Holding Corp. v. Roven*, 26 F.3d 960,

964 (9th Cir. 1994).

In considering a motion for summary judgment, "the court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec.*, 809 F.2d at 631 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)) (footnote omitted). Inferences must be drawn in favor of the nonmoving party. *See id*. However, when the nonmoving party offers no direct evidence of a material fact, inferences may be drawn only if they are reasonable in light of the other undisputed background or contextual facts and if they are permissible under the governing substantive law. *See id*. at 631–32. If the factual context makes the nonmoving party's claim implausible, that party must come forward with more persuasive evidence than otherwise necessary to show there is a genuine issue for trial. *See Bator v. Hawaii*, 39 F.3d 1021, 1026 (9th Cir. 1994) (citing *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987)).

## III.   DISCUSSION

Miller's Motion is entirely based on the argument that the Court lacks personal jurisdiction over him. Federal courts ordinarily follow the forum state's law to determine the bounds of their jurisdiction over persons. *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (citing Fed. R. Civ. P. 4(k)(1)(A), which

11

provides that service of process is effective to establish personal jurisdiction over a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located"). The Court thus applies Hawaiʻi state law in determining its jurisdiction over Miller.

The jurisdiction of Hawaiʻi courts reaches the limits of due process set by the United States Constitution. *See Cowan v. First Ins. Co. of Hawaiʻi*, 61 Haw. 644, 649, 608 P.2d 394, 399 (1980) ("Hawaii's long-arm statute, HRS § 634-35, was adopted to expand the jurisdiction of the State's courts to the extent permitted by the due process clause of the Fourteenth Amendment."). The due process clause of the Fourteenth Amendment requires that a defendant "have certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).

There are two categories of personal jurisdiction: (1) general jurisdiction and (2) specific jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–15 (1984). Plaintiffs argue that the Court has both general and specific personal jurisdiction over Miller. ECF No. 90 at 6–7. Miller asserts that the Court has neither. *See* ECF No. 86-1 at 6. The Court discusses each category of jurisdiction below and concludes that it has specific, but not general, jurisdiction over Miller for some of the claims.

### A.    General Jurisdiction

General personal jurisdiction exists when the non-resident defendant maintains contacts so substantial, continuous, and systematic with the forum state, *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1171 (9th Cir. 2006), that the court can "render them essentially at home" there, *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe Co.*, 326 U.S. at 317).  A court may find general jurisdiction over an individual if they are domiciled or reside in the forum state.  *Daimler AG*, 571 U.S. at 137.  A limited liability company "is a citizen of every state of which its owners/members are citizens."  *Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006).

Plaintiffs allege in the SAC that Miller has "been physically present conducting business within the State of Hawaii."  ECF No. 18 at 7 ¶ 31.  They also argue in their Opposition that the Court has general jurisdiction pursuant to Hawaii's long arm statute, HRS § 634-35 ("Hawaii's Long Arm Statute").  ECF No. 90 at 5–6.  The Court disagrees.

"The standard for general jurisdiction is high; contacts with a state must 'approximate physical presence.'"  *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1169 (9th Cir. 2006) (quoting *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000)).  "Put another way, a defendant must

not only step through the door, it must also '[sit] down and [make] itself at home.'"
*Id*. (quoting G*lencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co*., 284
F.3d 1114, 1125 (9th Cir. 2002)) (alterations in original).

Plaintiffs fail to meet the "high" standards for establishing general
jurisdiction.  First, Plaintiffs allege that Miller is a resident and citizen of
Tennessee, not Hawaiʻi.  ECF No. 18 at 2 ¶ 3.  And there are no other allegations
in the Complaint tending to show that Miller ever lived in Hawaiʻi, maintained a
residence in Hawaiʻi, or intended to make Hawaiʻi his home.  *See Goodyear*, 564
U.S. at 924 ("For an individual, the paradigm forum for the exercise of general
jurisdiction is the individual's domicile[.]").

Second, the Ninth Circuit considers a nonresident defendant's "[l]ongevity,
continuity, volume, economic impact, physical presence, and integration into the
state's regulatory or economic markets," to determine whether the nonresident
defendant's contacts are sufficiently substantial, continuous, and systematic.
*CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1074 (quoting *Tuazon*,
433 F.3d at 1172) (alteration in original).  Miller states that he has traveled to
Hawaiʻi on three occasions—in 2015, 2016, and 2017—and Plaintiffs do not refute
this assertion.  *See* MCSF at 2 ¶ 4; PCSF at 2 ¶ 4.  Plaintiffs do not offer any
further information on his contacts and admit they do not know if he owns or rents
any property in Hawaiʻi, has a bank account or ever paid taxes in Hawaiʻi, has any

14

professional or personal licenses in Hawaiʻi, has ever registered a business to operate in Hawaiʻi, or has ever maintained an office in Hawaiʻi.  MCSF at 3 ¶ 12; PCSF at 3 ¶ 12.  Three visits to Hawaiʻi, each spaced two years apart, and regardless of the trips' purposes, is simply not enough for this Court to conclude that Miller's contacts with Hawaiʻi are sufficiently substantial, continuous, and systematic to support general jurisdiction.  *See, e.g., CollegeSource*, 653 F.3d at 1075 ("Marketing to forum residents, at least where such marketing does not result in substantial and continuous commerce with the forum, does not support general jurisdiction."); *Goodyear*, 564 U.S. at 930 ("[E]ven regularly occurring sales of a product in a State do not justify the exercise of jurisdiction over a claim unrelated to those sales.").  It is evident Hawaiʻi is not Miller's home.

The Court concludes that Plaintiffs fail to allege sufficient facts, much less produce sufficient evidence, for this Court to exercise general jurisdiction over Miller on any of Plaintiffs' claims against him.

**B.     Specific Jurisdiction**

In determining whether specific personal jurisdiction exists over a non-resident party, courts generally conduct a three-part inquiry—commonly referred to as the minimum contacts test—to determine whether the party has sufficient contacts with the forum to warrant the court's exercise of jurisdiction. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 9th Cir. 2004).  The

minimum contacts test "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal quotation marks and citation omitted).

The minimum contacts test requires the following for a court to exercise personal jurisdiction over a non-resident:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802.  "The plaintiff bears the burden on the first two prongs." *Boschetto v. Hansing*, 539 F.3d 1011, 1016 (citation omitted).  "If the plaintiff establishes both prongs one and two, the defendant must come forward with a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Id*. (quoting *Schwarzenegger*, 374 F.3d at 802 (quoting *Burger King*, 471 U.S. at 476–78)).  But if the plaintiff fails to establish the first two prongs, "the jurisdictional inquiry ends and the case must be dismissed." *Id.* (citing *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006) ("[Plaintiff's] arguments

16

fail under the first prong.  Accordingly, we need not address [the remaining two prongs]."  (alterations in original))).

Before the Court turns to its minimum contacts analysis on the claims asserted against Miller, the Court discusses the first prong of the minimum contacts test in some depth.  The Ninth Circuit treats purposeful direction and purposeful availment under the first prong of the three-part specific jurisdiction test as two distinct concepts.  *Schwarzenegger*, 374 F.3d at 802.  But discerning when to apply which of these two is somewhat nuanced.  Indeed, the "exact form of [the] jurisdictional inquiry depends on the nature of the claim at issue."  *In re Boon Glob. Ltd.*, 923 F.3d 643, 651 (9th Cir. 2019) (quoting *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015)).

Generally, "[f]or claims sounding in contract, a purposeful availment test is used."  *Id.* (*citing Picot*, 780 F.3d at 1212).  The analysis for tort claims is more complicated.  If the tortfeasor was outside the forum when they committed the tort, then courts are to determine whether the tortfeasor purposefully directed their activities at the forum state by applying the "effects" test of *Calder v. Jones*, 465 U.S. 783, 789–90 (1984).  *See Freestream Aircraft (Bermuda) Ltd. v. Aero L. Grp.*, 905 F.3d 597, 606 (9th Cir. 2018).  "[U]nder the *Calder* effects test, purposeful direction exists when a defendant allegedly: '(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is

likely to be suffered in the forum state.'"  *Id.* at 603 n.3 (quoting *Schwarzenegger*, 374 F.3d at 803 (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002))).

But where the tortfeasor was in the forum state when they committed the tort, then they are deemed to have purposefully availed themselves of the privilege of conducting activities in the forum.  *See id.* at 606.  "When a non-resident has voluntarily entered a state and invoked the protections of its laws, it does not . . . offend traditional notions of fair play and substantial justice to require the non-resident to answer in the courts of the state for any tortious acts committed while there."  *Id.* (internal quotation marks, alterations, and citation omitted).  Indeed, Hawaii's Long Arm Statute states as much.  *See Greys Ave. Partners, LLC v. Theyers*, 431 F. Supp. 3d 1121, 1128 n.7 (D. Haw. 2020) ("HRS section 634-35 provides that a nonresident who transacts business in Hawai'i or commits a tortious act within Hawai'i thereby submits to the jurisdiction of courts in Hawai'i for a cause of action arising out of such conduct."  (citing HRS § 634-35(a))).

Suffice it to say "*Calder* extended the reach of personal jurisdiction to a defendant who never physically entered the forum state."  *Freestream Aircraft*, 905 F.3d at 604 (citing *Haisten v. Grass Valley Med. Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1397 (9th Cir. 1986)).  So purposeful direction is satisfied for out-of-state defendants if the requirements of the *Calder* effects test are met.  And "the

'purposeful availment' requirement is satisfied if the defendant has taken deliberate action within the forum state." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995).

Plaintiffs argue that the Court may exercise specific jurisdiction over Miller under both the purposeful direction and purposeful availment tests. *See* ECF No. No. 90 at 7–9. Because "[p]ersonal jurisdiction must exist for each claim asserted against a defendant[,]" *Action Embroidery Corp. v. Atl. Embroidery, Inc*., 368 F.3d 1174, 1180 (9th Cir. 2004) (citation omitted), the Court must apply the minimum contacts test to each of Plaintiffs' claims.

### 1.      The Enforcement of Promissory Notes Claim

"A showing that a defendant purposefully availed himself of the privilege of doing business in a forum state typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there." *Schwarzenegger*, 374 F.3d at 802.  So for contract claims, it naturally follows that the purposeful availment test applies because it involves a non-resident defendant entering into a contract with a forum resident.  *Id.*.  "Purposeful availment analysis examines whether the defendant's contacts with the forum are attributable to his own actions or are solely the actions of the plaintiff."  *In Int. of Doe*, 83 Hawaiʻi 367, 374, 926 P.2d 1290, 1297, *opinion amended on reconsideration*, 83 Hawaiʻi 545, 928 P.2d 39 (1996) (quoting *Sinatra v. Nat'l Enquirer, Inc*., 854 F.2d 1191,

1195 (9th Cir. 1988) (citations omitted)).  A non-resident defendant purposefully avails themselves of conducting activities in the forum if they have performed "some type of affirmative conduct which allows or promotes the transaction of business within the forum state."  *Sinatra*, 854 F.3d at 1195 (citation omitted).

Here, the parties dispute where the contract was executed, but this issue is not dispositive as Miller accepts that he met with Barton Eng in connection with the Notes, and that Shelby Holdings, which he is a member of, MCSF at 2 ¶ 3, executed the Notes in favor of Barton Eng, a Hawaiʻi resident, *id*. at 4 ¶ 13.  Three issues arise out of the foregoing:  (1) Whether the Court may exercise jurisdiction over Miller even if he signed the Notes on behalf of Shelby Holdings; (2) Whether Miller's dealings with respect to the Notes are sufficient to exercise specific jurisdiction for the Enforcement of Promissory Notes claim, i.e., the purposeful availment requirement is met; and (3) If the purposeful availment requirement is met, whether exercise of specific personal jurisdiction comports with due process.

Before turning to the purposeful availment analysis, the Court addresses Miller's argument that the exercise of specific jurisdiction over him for the Enforcement of Promissory Notes claim is improper because "companies can only act through their members; therefore, Miller could have only signed the Note on behalf of Shelby in his capacity as a member" of Shelby Holdings.  ECF No. 86-1 at 19.

### a.   Alter Ego Theory

The Ninth Circuit has rejected the argument that a court may not consider actions that corporate officers took on behalf of their corporations when determining jurisdiction. *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1109 (9th Cir. 2020).  Although individual defendants' contacts with a forum state are not to be judged according to their employer's activities there, "their status as employees does not somehow insulate them from jurisdiction.  Each defendant's contacts with the forum State must be assessed individually." *Calder*, 465 U.S. at 790.

The Ninth Circuit looks to the forum's law to determine if state law limits personal jurisdiction over corporate officers who act on behalf of their corporations. *See Glob. Commodities*, 972 F.3d at 1109 (explaining "that the state's long-arm statute allowed the exercise of personal jurisdiction to the limits of the federal Constitution, and therefore did not shield corporate officers from jurisdiction over their persons based on actions within the scope of their employment"); *see also Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1393 (9th Cir. 1984) (applying California law to conclude that "[w]here a corporation is the alter ego of the stockholders so as to justify disregard of the corporate entity[,] jurisdiction over the corporation will support jurisdiction over the stockholders" (citation omitted)).  Under Hawaiʻi law, "a court may 'pierce the corporate veil'—

21

look past a corporation's formal existence to hold another entity or individual liable—when that entity or individual treats the corporation as his 'alter ego.'" *Lewis v. Lewis Elec*., LLC, 2021 WL 6113551, at *7 (D. Haw. Dec. 27, 2021), *on reconsideration in part*, 2022 WL 268985 (D. Haw. Jan. 28, 2022) (quoting *Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co*., 982 P.2d 853, 869 (Haw. 1999), s*uperseded by statute on other grounds as noted in Davis v. Four Seasons Hotel Ltd*., 228 P.3d 303, 308 n.9 (Haw. 2010)).  "[T]he alter ego doctrine does not create a separate cause of action, but rather, creates a means for an individual (the alter ego) to be held personally liable for a cause of action against a corporate entity."  *Calipjo v. Purdy*, 144 Hawai'i 266, 282, 439 P.3d 218, 234 (2019).

The Court finds that it is too early to grant summary judgment based on a lack of personal jurisdiction over Miller on the theory that he signed the Notes on behalf of Shelby Holdings and not in his individual capacity.  This is particularly so because the jurisdictional facts in this case are intertwined with the merits.  *See Data Disc, Inc. v. Sys. Tech. Assocs., Inc*., 557 F.2d 1280, 1285 n.2 (9th Cir. 1977). "Where the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits, the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial."  *Augustine v. United States*,

704 F.2d 1074, 1077 (9th Cir. 1983); *Gulf Oil Corp. v. Copp Paving Co*., 419 U.S. 186, 203 n.19 (1974) (citing *McBeath v. Inter-Am. Citizens for Decency Comm*., 374 F.2d 359, 363 (5th Cir. 1967) ("McBeath should have been allowed to develop this evidence in a full hearing on the merits where the issue of jurisdiction and the merits are so closely tied together and inseparable.  It was error for the court summarily to preclude him from so doing.")).  Although a court would generally decide jurisdictional issues before the merits of a case, "if the attack on jurisdiction requires the court to consider the merits of the case, the court has jurisdiction to proceed to a decision on the merits." *Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp*., 594 F.2d 730, 733–34 (9th Cir. 1979) (citing *Land v. Dollar*, 330 U.S. 731, 739 (1947) (holding that in cases "where the question of jurisdiction is dependent on decision of the merits," *Thornhill*, 594 F.2d at 735, "the District Court has jurisdiction to determine its jurisdiction by proceeding to a decision on the merits," *id*. at 739)).

Miller argues that he should not be subjected to Hawaii's jurisdiction on the Enforcement of Promissory Notes claim because he signed the Notes on behalf of Shelby Holdings.  But it is very possible that after the parties begin discovery and the parties litigate the actual merits of this claim, certain facts will come to light indicating Miller should be liable for the Notes even if he didn't sign them in his individual capacity, thus subjecting him to Hawaii's jurisdiction.  "[I]n such cases,

it is preferable that [the jurisdictional] determination be made at trial, where a plaintiff may present his case in a coherent, orderly fashion and without the risk of prejudicing his case on the merits." *Data Disc,* 557 F.2d at 1285 n.2.

By deciding now that the Court cannot assert personal jurisdiction over Miller because he cannot be held responsible for the Notes, the Court would be making a decision on the merits of the claim, i.e., that Shelby Holdings, not Miller is liable for the contract, foreclosing Plaintiffs from utilizing jurisdictional discovery to present evidence to the contrary. The parties have not even had a Rule 16 Scheduling Conference to date, much less any discovery. And Plaintiffs still have an opportunity to amend their SAC or seek leave to amend their claims against Miller.

The Court concludes that at this stage of the litigation, Plaintiffs should only be required to establish a prima facie showing of jurisdictional facts as they would on a motion to dismiss. *See id.* (concluding that "where the jurisdictional facts are enmeshed with the merits," the district court may decide that the plaintiff "should be required only to establish a prima facie showing of jurisdictional facts with affidavits and perhaps discovery materials"). For the reasons discussed below, the Court concludes that Plaintiffs have made such a prima facie showing of jurisdictional facts for their Enforcement of Promissory Notes claim under the Hawai'i Supreme Court's two-step inquiry.

24

### b.    Minimum Contacts

Hawaii's Long Arm Statute provides that any person, whether or not a citizen or resident of Hawai'i, "who in person or through an agent" transacts any business within Hawai'i, submits to the jurisdiction of Hawai'i courts "as to any cause of action arising from" the "transaction of any business within" Hawai'i. HRS § 634-35(a)(1).  The Hawai'i Supreme Court engages in a two-step inquiry for personal jurisdiction.  Its caselaw provides that "[p]ersonal jurisdiction exists when (1) the defendant's activity falls under the State's long-arm statute, and (2) the application of the statute complies with constitutional due process." *Norris v. Six Flags Theme Parks, Inc*., 102 Hawai'i 203, 207, 74 P.3d 26, 30 (2003), *as corrected* (Aug. 12, 2003) (citation omitted).  The Hawai'i Supreme Court has opined on the "value in remembering that personal jurisdiction rests on both negative federal limits and positive state assertions of jurisdiction." *Yamashita v. LG Chem, Ltd.*, 152 Hawai'i 19, 22, 518 P.3d 1169, 1172 (2022), *opinion after certified question answered*, 62 F.4th 496 (9th Cir. 2023).  It explained, "[t]hat the legislature has chosen to align the inquiry into personal jurisdiction in Hawai'i with an inquiry into constitutional due process limits does not mean this must always be the case." *Id*.  The Court finds this guidance worthwhile for this cause of action.

The Court examines Miller's contacts under Hawaii's personal jurisdiction jurisprudence, employing Hawaiʻi state law to determine if Miller performed "some type of affirmative conduct which allows or promotes the transaction of business within the forum state." *Sinatra*, 854 F.3d at 1195; *see also Hanna v. Plumer*, 380 U.S. 460, 465 (1965) ("[F]ederal courts sitting in diversity cases, when deciding questions of 'substantive' law, are bound by state court decisions as well as state statutes." (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938))).

There is no question that Miller executed two promissory notes in favor of Barton Eng, who is a Hawaiʻi citizen.  MCSF at 4 ¶ 13; PCSF at 3 ¶ 13.  So under the Hawaiʻi Supreme Court's two-step inquiry, the Court must examine whether entering into these agreements constitutes the "transaction of any business" within Hawaiʻi, and if so, whether this application of Hawaii's Long Arm Statute comports with the requirements of due process under *International Shoe Co. v. Washington*, 326 U.S. 310 (1945).  *See Cowan*, 61 Haw. at 654, 608 P.3d at 401.

> i.    Step 1 - Transacting Business in Hawaii

Miller contends that the Notes arose out of events occurring outside of Hawaiʻi.  *See* ECF No. 86-1 at 19.  Based on this he argues that the first prong of the minimum contacts test, purposeful availment, is not met.  *Id*. at 20.  The Court disagrees.

The parties appear to dispute the exact circumstances of how the Notes were executed. Barton Eng asserts that he signed the Notes "in Hawaii in June of 2017 on a 'State of Hawaii' form as the first to sign and then these 2 notes were then transmitted electronically to Banta who, in turn, emailed them onto [sic] Defendant Miller and his company, Shelby Holdings, LLC for signature in Tennessee." ECF No. 91-1 at 10; *see also* ECF No. 91-7 at 4 (providing what appears to be an email chain from Barton Eng to Defendant Banta on June 13, 2017). It appears that Miller agrees that Mr. Eng signed the Notes, but it is unclear if Miller accepts that Mr. Eng signed the Notes in Hawaiʻi. *See* ECF No. 95 at 4 ¶ 13; *id*. at 5 ¶ 17. There is no evidence to contradict that Barton Eng signed the Notes in Hawaiʻi, and in any case, this is probably an easily discoverable fact once discovery begins.

Miller states that the Notes were a "result of a meeting [he] had with Plaintiff Barton Eng in Memphis, Tennessee in May or June 2017. The purpose of this meeting was to discuss potential investment properties in Memphis, Tennessee and had nothing to do with any of the claims asserted in this cause." ECF No. 87-1 at 4 ¶ 11. Miller also states that "Barton Eng did not invest in any of the properties in Memphis, Tennessee, but he and Defendant Tyler Banta did subsequently contact [Miller] about a potential loan. These communications included phone calls between [Miller], Banta and Barton Eng while [Miller] was in Memphis, Tennessee." *Id*. at 4 ¶ 12. Subsequent to these communications with Banta and

Mr. Eng, Miller states that he "signed the Promissory Notes on behalf of Shelby while [he] was in Memphis, Tennessee on or about June 11, 2017." *Id*. at 4 ¶ 13.

But where Miller signed the contract is not dispositive as to whether Hawaii's Long Arm Statute applies to the transaction. "[I]t is well-established that a nonresident defendant may be found to have transacted business in a state even though neither the defendant, nor any agent of the defendant, had ever been physically present in the forum." *Cowan*, 61 Haw. at 651–52, 608 P.2d at 400 (*citing Haw. Credit Card Corp. v. Cont'l Credit Card Corp*., 290 F. Supp. 848 (D. Haw. 1968) (applying HRS § 634-35)) (other citation omitted). Even where the place of contracting is in dispute, when the "facts clearly establish the existence of a contractual relationship between the parties and the performance in Hawaii of vital legal acts necessary for the formation of that contract," i.e., offer or acceptance, "the precise time and location at which the contract became binding need not be decided." *Id.* at 650–51, 608 P.2d at 400; *see also id*. ("Courts in other jurisdictions interpreting similar statutes have held that where an interstate contract consummated through the mail or by telephone is involved the place of the last act of execution is not, of itself, determinative of whether any business has been transacted in the forum."). Rather, "finding the requisite transaction of business demands an examination of all of the defendants' activities within the forum related to the present cause of action." *Id*. at 652, 608 P.2d at 400.

28

Viewing the facts in the light most favorable to Plaintiffs, the Court finds that it is likely Barton Eng signed the Notes in Hawai'i and that Miller knew Mr. Eng was a Hawai'i resident and that he was obligated under the Notes to direct payments to Hawai'i when Miller signed it.  The Notes have "State of Hawai" at the top and provide, "I promise to pay to Specialized IRA Services FBO Barton Eng, Traditional IRA or order at Honolulu, Hawai'i or place designated by holder(s) hereof."  ECF No. 91-7; *see also* ECF No. 18-2.  The Court concludes that under Hawai'i law, Miller's actions with respect to the Notes constitute the transaction of business in Hawai'i.  *See Cowan*, 61 Haw. at 651–52, 608 P.2d at 400 (finding defendants did transact business in Hawai'i under Hawaii's Long Arm Statute because defendants engaged in significant business activities in Hawai'i relating to the execution and performance of the contract through interstate communications, namely, defendants entered into a contractual relationship with the plaintiff, a resident of Hawai'i; the contract was mailed by defendants to Hawai'i for the plaintiff's signature; the duties and obligations arising from the contract involved the sale of plaintiff's boat in Hawai'i; and defendants' contacts with Hawai'i included advertising and solicitation that gave rise to the cause of action).

In light of Miller's interactions with Mr. Eng, whom he knew was a Hawai'i resident, coupled with (1) his signing of the Notes that prominently display "State

of Hawaii," and (2) the fact that the money borrowed under the Notes was from a

Hawaiʻi citizen and payable in "Honolulu, Hawaii," *see* ECF Nos. 18-1 and 18-2,

the Court concludes that Plaintiffs have made a prima facie showing of

jurisdictional facts.

ii.      Step 2 - The Limits of Due Process

Although the Court concludes Plaintiffs have made a sufficient showing of

jurisdictional facts, the Court's exercise of jurisdiction must nonetheless comport

with due process.  "[T]he constitutional standard for determining whether [the

Court] may enter a binding judgment against [Miller] here is that set forth in . . .

*International Shoe Co. v. Washington*," which held a defendant must "have certain

minimum contacts with [the forum State] such that the maintenance of the suit

does not offend 'traditional notions of fair play and substantial justice.'"  *Kulko v.*

*Superior Ct. of Cali. In & For City & Cnty. of S.F.*, 436 U.S. 84, 92 (1978)

(quoting *Int'l Shoe*, 326 U.S. at 316) (third alteration in original) (citation omitted).

Traditional notions of fair play and substantial justice consider "the interests of the

forum State and of the plaintiff in proceeding with the cause in the plaintiff's

forum of choice."  *Id*. (citing *McGee v. Int'l Life Ins. Co*., 355 U.S. 220, 223

(1957)).  But "an essential criterion in all cases is whether the 'quality and nature'

of the defendant's activity is such that it is 'reasonable' and 'fair' to require him to

conduct his defense in that State." *Id*. (quoting *Int'l Shoe*, 326 U.S. at 316–17, 319).

Miller states that he did not meet or converse with Plaintiffs during either of his two visits to Hawaiʻi in or around May 2015 and September 2017. ECF No. 87-1 at 3 ¶ 6. But he does acknowledge that he met with Barton Eng before signing the Notes, that the Notes were a result of this meeting, that the meeting was to discuss potential investment properties in Memphis, and that he communicated by telephone with Mr. Eng. *Id*. at 4 ¶ 11. The result of these interactions culminated in Miller executing two contracts that patently declare "State of Hawaii" on them, under which a Hawaiʻi resident loaned $330,000 to Miller in exchange for Miller's promise to direct payments "at Honolulu, Hawaii."

Miller also acknowledges that his September 2017 and October 2019 visits to Hawaiʻi were made in connection with presentations to potential investors concerning investment property opportunities outside of Hawaiʻi. *Id*. at 2 ¶ 4. Miller also provides that he made two payments of $20,000 in connection with the Notes, which required annual payments of $10,000 payable to Mr. Eng's traditional IRA. *See* MCSF at 4 ¶¶ 19–20. Plaintiffs refute that Miller made any payments on either of the Notes. *See* PCSF at 4 ¶ 20.

Nonetheless, Miller knew he was contracting with a Hawaiʻi resident, knew he received money from a Hawaiʻi resident's IRA, asserts he made payments to a

31

Hawaiʻi resident, and acknowledges he sought investors in Hawaiʻi on at least two occasions when visiting in 2017 and 2019.  Despite benefitting from a Hawaiʻi resident and pursuing business in Hawaiʻi, Miller states he should not be subject to Hawaii's jurisdiction because he lives in Tennessee and didn't sign the contract in Hawaiʻi or discuss its terms in Hawaiʻi.  The Court disagrees.

Due process does not shield Miller from Hawaii's jurisdictional reach.  The United States Supreme Court recently rejected the idea that "[j]urisdiction attaches only if the defendant's forum conduct gave rise to the plaintiff's claims." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021) ("None of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do.").  Although *Ford* involved the marketing and sale of cars, the Supreme Court's analysis is helpful.  The Supreme Court explained that because the non-resident defendant enjoyed the "benefit and protection" of the forum state's laws, such as forming an effective market for its business, the non-resident defendant's in-state business created the reciprocal obligation to produce cars that are safe for the forum state's citizens to use.  *Id*.  The Supreme Court concluded that a "state court's enforcement of that commitment, enmeshed as it is with [the non-resident's] government-protected in-state business, can 'hardly be said to be undue.'"  *Id*. at 1030.

Here, Miller made two visits to Hawai'i "in connection with presentations by Miller to potential investors concerning investment property opportunities outside of Hawai'i."  MCSF at 2 ¶ 4.  Although the properties he sought investments for were located outside of Hawai'i, Miller was nonetheless seeking investments from people in Hawai'i.  *See* ECF No. 87-1 at 2 ¶ 4.  Also, Miller could very well have engaged in and directed activities to Hawai'i even if he wasn't in the forum state.  Again, discovery would assist with revealing such facts.

Due Process does not require a strict causal relationship between Miller's contacts with Hawai'i and the Enforcement of Promissory Notes claim so long as the claim "arise[s] out of *or relate*[s] *to* the defendant's contacts with the forum."  *Ford*, 141 S. Ct. at 1026 (emphasis in original) (citation omitted).  So although Miller's contacts with Hawai'i may not have a strict causal relationship with this claim, based on his contacts with Hawai'i and his acceptance of a contract with a Hawai'i resident, Miller should have reasonably anticipated being haled into Hawai'i courts to defend an action based on products or services he sought investments for and that caused injuries in Hawai'i.  *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (explaining that "the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State.  Rather,

33

it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there").

The Court thus concludes that Miller falls under Hawaii's Long Arm Statute. More specifically, the Court concludes that, at least at this pre-discovery point in the case, Miller transacted business within Hawaiʻi and that the exercise of Hawaii's jurisdiction over him comports with due process. Viewing the facts in the light most favorable to Plaintiffs, Miller purposefully availed himself of the privilege of conducting activities within Hawaiʻi, thus invoking the benefits and protections of its laws, so it was foreseeable that Miller should have reasonably anticipated being haled into Hawaiʻi courts. *Cowan*, 61 Hawaiʻi at 657, 608 P.2d at 403 (relying on a Hawaiʻi federal district court decision when concluding that "other courts have held constitutional the assertion of jurisdiction over a nonresident defendant in a breach of contract action where the contract had been negotiated and executed entirely through interstate communications") (citing *Haw. Credit Card Corp.*, 290 F. Supp. 848). Plaintiffs have alleged sufficient jurisdictional facts for this Court to exercise personal specific jurisdiction over this claim at this point in the case.

The Court DENIES summary judgment as to the Enforcement of Promissory Notes claim.

### c. Venue

Miller also argues that venue is improper in this Court. He argues, "[w]ith respect to any contract-based claims against Miller, a claim generally arises for [28 U.S.C.] § 1391(b)(2) purposes in the 'place of intended performance.'" ECF No. 86-1 at 27–28 (quoting *Decker Coal Co. v. Commonwealth Edison Co*., 805 F.2d 834, 842 (9th Cir. 1986)). In *Decker Coal*, the Ninth Circuit opined that "the spirit of" 28 U.S.C. § 1391(a), titled Venue generally, "is better served in this case if venue for a claim based on breach of contract be the place of intended performance rather than the place of repudiation." 805 F.2d at 842. The Ninth Circuit indicated it favored this rule "because the place of performance is determined at the inception of the contract and therefore parties can anticipate where they may be sued." *Id*.

Miller transacted business in Hawaiʻi because he borrowed money from a Hawaiʻi resident, because the Notes provided that Miller would pay or order the money at "Honolulu, Hawaii," and because Miller solicited investors in Hawaiʻi after he executed the Notes. Hawaiʻi was/is the place of performance and Miller should have anticipated being sued in Hawaiʻi for failing to perform under the Notes.

Further supporting Hawaiʻi as the proper venue is that Miller does not provide where a more appropriate venue would be for the Enforcement of

35

Promissory Notes claim.  The only other place the Court would consider transferring this claim is Tennessee because it is where Miller resides and where one meeting occurred.  But Tennessee doesn't have as much skin in this game as Hawaiʻi.  Plaintiffs chose to bring this action in Hawaiʻi and allege they suffered injuries in Hawaiʻi, ECF No. 1 at 7 ¶ 7.  *See Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446, 1449 (9th Cir. 1990) ("This Circuit has found that while a U.S. citizen has no absolute right to sue in a U.S. court, great deference is due plaintiffs because a showing of convenience by a party who has sued in his home forum will usually outweigh the inconvenience the defendant may have shown.").  The Court concludes that Hawaiʻi has the most interest in adjudicating this action.  *See Kailieha v. Hayes*, 56 Haw. 306, 317, 536 P.2d 568, 575 (1975) (opining that Hawaiʻi has a "constellation of interests" including an "interest in securing redress for its citizens injured within its borders, and an interest in interpreting its own substantive law").

Because the Court concludes that jurisdiction and venue are proper in Hawaiʻi , the Court DENIES Miller's alternative motion to dismiss for improper venue and will allow for jurisdictional discovery on that claim.

### 2.    The Misrepresentation Claim

As stated above, the Misrepresentation claim against Miller alleges that he told Plaintiffs that GM Realty and GM Realty Management (collectively, "GM")

had rehabbed Plaintiffs' property located at "4425 Michigan," when they had not. ECF No. 18 at 13 ¶ 70.  Plaintiffs also accuse him, GM, Defendant Katsimbrakis, and St. Louis Redevelopment of selling Plaintiffs a property at "3100 Mt Pleasant," but failing to deliver title and falsely representing that the home was rehabbed, or would be rehabbed by GM, and providing Plaintiffs with a "Scope of Work" document that related to a different property, along with pictures of the alleged rehabbed property only and not of the property in its original condition.  *Id.* at 13–14 ¶¶ 71–73.

In the Motion, Miller argues that Plaintiffs cannot meet the purposeful direction test for this claim.  ECF No. 86-1 at 20.  He contends that none of the transactions tied to the rehab work occurred in Hawai'i.  *Id.* at 21.  Rather, he reports, Barton Eng contacted Miller while Miller was in Tennessee, inquiring about GM's property management services.  MCSF at ¶ 21.  According to Miller, Barton Eng executed the PMA with GM, under which Barton Eng would pay GM for property management services for a variety of properties, including the 4425 Michigan property located in St. Louis.  *Id.* at 4 ¶¶ 23–24.  GM also managed properties for Barton Eng located at 3100 Mt. Pleasant, 4532 Pennsylvania, and 5000-02 Idaho, in Missouri.  *Id.* at 5 ¶ 25.  He further asserts that neither he nor GM were involved in the sale of these three properties.  *Id.*

Plaintiffs respond by arguing that Miller purposefully directed his activities to Hawaiʻi by flying here, soliciting business, and representing that he was part of a team of people and entities offering financial opportunities. ECF No. 90 at 7–8. In their Concise Statement of Facts, Plaintiffs dispute the notion that Barton Eng contacted Miller to inquire about GM's management services. PCSF at 4 ¶ 21. Rather, they contend, the opportunity to take advantage of Miller's property management services "was part of the 'plan' developed by Defendant Tyler Banta on behalf of the 'team,' which included Miller." *Id* at ¶ 21.

But Plaintiffs admit that Barton Eng entered into the PMA with GM, under which GM provided property management services for the four properties in Missouri. *Id.* at 4–5 ¶¶ 23–25. They also admit that Miller and GM were not involved in the sale of 3100 Mt. Pleasant, which is the sale that forms much of the basis of the Misrepresentation claim. *Id.* at 5 ¶ 25; *see* ECF No. 18 (SAC) at 13–14 ¶ 71 (alleging that the property at 3100 Mt. Pleasant was allegedly "sold" to Plaintiffs, but Plaintiffs never received title, and that undated misrepresentations were made about the rehab work on the property, GM's involvement in that rehab work, and Miller and GM provided a Scope of Work document of another property).

In any event, it is undisputed that the PMA was entered into on October 10, 2017, PCSF at 4 ¶ 23, and that Miller had traveled to Hawaiʻi in September 2017

38

and October 2019 to make presentations to potential investors in real estate outside

of Hawaiʻi, *id.* at 2 ¶ 4.  The parties also agree that Miller did not meet or converse

with Plaintiffs during his Hawaiʻi trips.  *Id.* at 2 ¶ 6 (refuting only insofar as Miller

had "previously met with Plaintiff Barton Eng by this time").  Rather, Barton

Eng's own declaration indicates that, by the time of Miller's first business trip to

Hawaiʻi in September 2017, "[Plaintiffs] were already onboard as clients of the

'team' by that point."  ECF No. 91-1 at ¶ 13. Also, the fact that Plaintiffs attended

a presentation that Miller gave with others at a Hawaiʻi hotel in October 2019 does

not appear to have anything to do with the specific and undated misrepresentations

attributed to Miller in the SAC.

Therefore, even when viewing the facts in the light most favorable to

Plaintiffs, the alleged torts in the Misrepresentation claim did not occur while

Miller was in Hawaiʻi. So what does this all mean for personal jurisdiction?  It

means that because Miller was not in Hawaiʻi at the time the alleged

misrepresentations and resulting injuries occurred, the Court must consider

whether Miller purposefully directed his activities at Hawaiʻi under the *Calder*

effects test.  *See Freestream*, 905 F.3d at 606.

Nothing in the facts suggest that Miller's alleged misrepresentations meet

the purposeful direction test, i.e., intentional acts, expressly aimed at the forum

state, causing harm that the defendant knows is likely to be suffered in the forum

state.  *Id.* at 603 n.3 (citation omitted); *cf. Leff v. Bertozzi Felice Di Giovanni Rovai & C. Srl.*, 2015 WL 9918660 at *3 (D. Haw. Dec. 30, 2015) (applying purposeful direction test to misrepresentation claim and concluding that the defendant's acts were expressly aimed at the forum state where "Mr. Rovai traveled to Hawaii in order to meet with Plaintiffs and to observe the construction site" and "made representations to Plaintiffs, who are residents of Hawaii, regarding the materials to be used in the construction of their house in Hawaii" and such acts "occurred in the forum, [were] directed at forum residents, and regarded activities taking place in forum").

In addition, the subject matter of those misrepresentations involved property outside of Hawai'i.  So Plaintiffs cannot meet the second prong of the minimum contacts claim—that the claim must be one that arises out of or relates to the Miller's forum-related activities.  Because there was no purposeful direction, there were no forum-related activities under which this claim could arise out of or relate to.

The Court concludes that Plaintiffs fail to meet the first and second prongs of the minimum contacts test and, thus, this Court does not have specific personal jurisdiction over Miller for purposes of the Misrepresentation claim.  *See Boschetto*, 539 F.3d at 1016 (holding that if a plaintiff fails to establish the first two prongs of the minimum contacts test, "the jurisdictional inquiry ends and the

case must be dismissed" (citation omitted)).  The Court GRANTS the Motion with

regard to the Fourth Cause of Action against Defendant Miller.

### 3.    The Fraud Claim

The only time Miller's name is mentioned in the Fraud claim is here:

> 86.    As a proximate consequence of the fraudulent conduct and
> statements by Defendants Banta, Miller, GM Realty, GM
> Management, Katsimbrakis, and St. Louis Redevelopment as
> alleged in paragraphs 76-83 above, Plaintiffs have suffered
> damages and incurred additional expenses at an amount to be
> proved at trial.
>
> 87.  Defendants Banta, Miller, GM Realty, GM Management,
> Katsimbrakis, St. Louis Redevelopment and Defendants Tycon
> Properties, Tycon 151, STL, and NPF [sic], fraudulent conduct
> and statements as alleged herein were willful, wanton, malicious,
> and oppressive and were undertaken with the intent to defraud
> Plaintiff Engs, and therefore justifies an award of exemplary and
> punitive damages.

ECF No. 18 at 17 ¶¶ 86–87.  Paragraph 76 realleges paragraphs 1 through 75 of the

SAC.  *Id*. at 15 ¶ 76.  And so, the Court interprets this Cause of Action as

reframing the misrepresentation cause as a fraud claim.  As such, it cannot survive

summary judgment for the same reasons, and the Court GRANTS the Motion with

regard to the Fifth Cause of Action against Miller.

### 4.    The Unfair and Deceptive Trade Practices Claim

Plaintiffs allege their UDAP claim against Miller, among many other

defendants.  Plaintiffs allege a laundry list of behaviors that amounted to the

commission of unfair or deceptive trade practices under Hawaiʻi law.  The alleged

behavior falls into three categories:  failing to deliver title and closing documents for properties Plaintiffs paid for; making false representations about Plaintiffs' rental property investments; and making statements at an October 5, 2019 event at a Hawai'i hotel indicating that multiple defendants were part of a "team" providing "turnkey" real estate investment opportunities.  *Id.* at 17–21.

But the problem with the UDAP claim is that it fails to distinguish between defendants for each of the acts and to identify what Miller himself did and what the other defendants did.  Also, Plaintiffs concede that Miller had nothing to do with the purchase of the properties mentioned in the SAC, and so anything relating to the failure to deliver title or closing documents cannot be an unfair and/or deceptive trade practice with respect to him.  *See* PCSF at ¶ 25.

Plaintiffs therefore appear to assert that Miller was involved in the false representations about the conditions of the investment properties and the benefits that would be gained by investing in them.  *See* ECF No. 18 at 18 (listing false representations related to the replacement of Plaintiffs' income, tax consequences, the rehabbed condition of the properties, and the fact that the properties would not need to be repaired for ten years).  But again, when and where these statements were made is not mentioned in the SAC and the Court cannot fill in those missing allegations for Plaintiffs.  The Court thus lacks sufficient information to assert specific personal jurisdiction based on these false representations.

The UDAP claim also asserts that Miller, along with Defendant Banta and Defendants the Conaways, made false representations at the October 5, 2019 hotel event that they were all involved in a partnership group, and that these representations amounted to an unfair and deceptive trade practice. *Id.* at 19–20 ¶¶ 93–97. The parties seem to agree that Miller did not have any direct contact with Plaintiffs during the event. *See* MCSF at 2 ¶ 6 ("Miller did not meet or converse with either Plaintiff before, after or during the event in October 2019, nor did he meet or converse with them during either of his other two visits to Hawaii"); PCSF at 2 ¶ 6 (refuting Miller's assertion, but providing that "Miller had previously met with Plaintiff Barton Eng by this time, and had been communicating with him electronically via email"). They also seem to agree that Miller himself did not represent that he was partners with any of the other co-defendants who attended the event. *See* MCSF at 3 ¶ 7 ("At the October 2019 event, Miller did not represent that he was in a 'partnership' or other working relationship with Defendants Tyler Bana, James Conway, Lorraine Conway, Giro Katsimbrakis, Tycon Properties, Inc., Tycon, 151, LLC, STL 100, LLC and/or New Paradigm Financial, Inc."); PCSF at 2 ¶ 7 ("Miller did appear with members of the 'team' and *others* so represented. However, he was already known to Plaintiffs as a partner in the 'turnkey team.'" (emphasis added)).

What the parties appear to dispute is whether Miller himself had any sort of business relationship with the other co-defendants as a "team" allegedly working for Plaintiffs.  Plaintiffs state that "Miller had an *ongoing* business relationship with all of these named Defendants and their respective companies during the period of Plaintiffs' injury, 2016-2019 [sic] and they all worked together for the alleged benefit of the Plaintiffs."  PCSF at 2 ¶ 8 (emphasis in original).  Miller flatly denies this, contending that "he was not part of a 'turnkey team' or any alleged 'plan' pertaining to Plaintiffs."  MRCSF at 3 ¶ 8.  But Miller does not explicitly indicate that he did not hear his co-defendants suggest otherwise at the hotel event.

So, when evaluating personal jurisdiction related to the UDAP claim, there appears to be a question of fact as to whether Miller was a part of this "turnkey team" or at least as to whether he failed to deny other defendants' representations at the hotel event regarding his membership in the "turnkey team."  The Court therefore utilizes the purposeful availment analysis for this claim because the Court evaluates the facts in the light most favorable to Plaintiffs, which, based on this record, means that Miller was in the forum when he committed at least some of the allegedly tortious acts that form the basis of the UDAP claim.  *See* HRS § 634-35(a) ("[A] nonresident who transacts business in Hawai'i *or commits a tortious*

44

*act within Hawaiʻi* thereby submits to the jurisdiction of courts in Hawaiʻi for a cause of action arising out of such conduct."  (emphasis added)).

Having determined for purposes of the Motion that Miller's allegedly unfair and deceptive trade practices fall under Hawaii's Long-Arm Statute, the Court now turns to the question of whether application of the statute comports with due process.  As explained previously, due process requires that a defendant have certain minimum contacts with the forum State "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice,'" *Int'l Shoe*, 326 U.S. at 316 (citations omitted), which considers "the interests of the forum State and of the plaintiff in proceeding with the cause in the plaintiff's forum of choice." *Kulko*, 436 U.S. at 92.  "[A]n essential criterion in all cases is whether the 'quality and nature' of the defendant's activity is such that it is 'reasonable' and 'fair' to require him to conduct his defense in that State." *Id*. (quoting *Int'l Shoe*, 326 U.S. at 316–317, 319).

But as the Court explained in section B, unlike cases involving out-of-forum tortfeasors, it is "well-settled . . . that the commission of a tort within the forum state usually supports the exercise of personal jurisdiction." *Freestream*, 905 F.3d at 606.  Indeed, when "a non-resident has voluntarily entered a state and invoked the protections of its laws, it does not . . . offend traditional notions of fair play and substantial justice to require the non-resident to answer in the courts of the state for

45

any tortious acts committed while there." *Id.* (internal quotation marks, brackets, citation omitted).

Miller was in Hawaiʻi on October 5, 2019 when he allegedly committed unfair and deceptive trade practices under Hawaii's laws; thus, Hawaii's Long Arm Statute submits Miller to its jurisdiction.  The exercise of this jurisdiction comports with due process because Miller voluntarily entered Hawaiʻi and invoked the protections of its laws when Miller presented to potential investors in Hawaiʻi on October 5, 2019.

And contrary to Miller's assertion that venue is not proper in Hawaiʻi, *see* ECF No. 86-1 at 27, the UDAP claim involves at least one alleged tort that occurred *in* Hawaiʻi.  There is no forum more appropriate than Hawaiʻi to evaluate whether Miller violated Hawaii's UDAP statute while Miller was in Hawaiʻi.

The Court thus determines that the exercise of jurisdiction over Miller for the UDAP claim is not unreasonable.  And, changing venue of this case to Tennessee would be improper because, contrary to what Miller argues, *see* ECF No. 86-1 at 27, the UDAP claim does involve at least one event that occurred in Hawaiʻi.  Therefore, the Motion is DENIED as to the UDAP claim.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART the Motion for Summary Judgment as follows:

1.      The Court GRANTS Miller's Motion for Summary Judgment as to the Misrepresentation and Fraud claims and thus DISMISSES the Misrepresentation and Fraud claims against Defendant Miller.

2.      The Court DENIES Miller's Motion for Summary Judgment as to the Enforcement of Promissory Note and UDAP claims, which are the only claims remaining against Defendant Miller.

IT IS SO ORDERED.

DATED:      Honolulu, Hawaiʻi, June 30, 2023.



Jill A. Otake
United States District Judge

CV 22-00309 JAO-WRP, *Eng v. Banta, et al.*; Order Granting in Part and Denying in Part Defendant Ewell D. Miller's Motion for Summary Judgment